AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with the Twitter account<br>@IAMTHESPOOKSTER, with User ID 2258794200 that<br>is stored at premises controlled by Twitter, Inc. | )<br>)<br>)<br>)<br>)<br>)    Case No.    3:19 mj 519 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the    __Northern__    District of    __California__ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

P. Andrew Gragan, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    __08/23/2019__

_____
*Judge's signature*

City and state:   Dayton, Ohio

Hon. Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE TWITTER ACCOUNT @IAMTHESPOOKSTER, WITH USER ID 2258794200, THAT IS STORED AT PREMISES CONTROLLED BY TWITTER, INC. | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, P. Andrew Gragan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant for information associated with Twitter account **@iamthespookster**, with user ID **2258794200** (hereinafter referred to as the "**ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Twitter, Inc. ("Twitter"), a social-networking company headquartered in San Francisco, California.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Twitter to disclose to the government records and other information in its possession, pertaining to the Twitter account.

2.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Cincinnati Division. I have been employed as a Special Agent with the FBI since May 2016.  I have received training in national-security investigations and criminal investigations, and I have conducted investigations related to international terrorism, white-collar crimes, drug trafficking, public corruption, firearms, and violent crimes.  As part of these investigations, I have

1

participated in physical surveillance and records analysis, worked with informants, conducted interviews, served court orders and subpoenas, and executed search warrants.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(3) (Possession of a firearm by an unlawful user of a controlled substance or by a person addicted to a controlled substance), 18 U.S.C. § 922(a)(6) (false statement regarding firearms), 18 U.S.C. § 924(a)(1)(A) (false statement regarding firearms), 18 U.S.C. § 1001 (false statement), and 21 U.S.C. § 844 (unlawful possession of a controlled substance), have been committed by Conner **BETTS** ("**BETTS**").  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court of the Southern District of Ohio is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      On or about August 4, 2019, at approximately 1:00 a.m., Dayton Police Officers responded to an active shooter in the 400 block of East Fifth Street in Dayton, Ohio. Officers observed a male, later identified as **BETTS**, actively engaged in shooting into a crowd of

2

individuals located at the 400 block of East Fifth Street in Dayton, Ohio, a city in the Southern District of Ohio.

7.     The Officers were able to return fire towards the suspect in order to stop the threat.  Multiple shots were fired, and **BETTS** was killed.  At this time ten (10) people, including **BETTS**, are deceased resulting from the shooting, along with multiple individuals injured. The injured were transported to multiple local area hospitals. **BETTS** was located on the scene wearing body-armor and headphones. During a search of the suspect, a black Samsung S8 Active cellular telephone was located in his back pocket.  A search warrant from the Dayton Municipal Court was obtained to search the content of this cellular telephone.  The phone number (937) 956-3637 was found to be the call number assigned to the phone. Officers were able to identify the weapon as an assault rifle style firearm.

8.     In the morning hours of August 4, 2019, the FBI was able to identify the shooter at the scene based on finger prints. The shooter was identified as **BETTS.**

9.     On or about August 4, 2019 a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Firearms Trace was conducted on the firearm used by **BETTS**, further described as an Anderson AM-15 5.56mm with serial number 18309695.  The purchaser was **Connor Stephen BETTS**, with an address of 2250 Creekview Place, Bellbrook, Ohio, date of birth (DOB) of October 28, 1994 and a Social Security Number (SSN) with the last four digits of 6211.  Ohio Bureau of Motor Vehicle (BMV) records reflect the same address, DOB, and last four digits of the SSN for **BETTS.**

10.     Records obtained from a Dayton-area Federal Firearm Licensed dealer included an ATF Form 4473, which based on my training and experience I know is required in order to complete the transaction of purchasing a firearm from a licensed dealer, for an Anderson Mfg

model AM-15 receiver with serial number 18309695, which, based on information provided by ATF, was manufactured outside the state of Ohio. The transferee/buyer was listed on the ATF Form 4473 as **Connor Stephen BETTS** with the aforementioned address, DOB, and SSN. **BETTS** provided (937) 956-3637 and cnnrbetts477@gmail.com as his contact information. The transfer of the firearm from the dealer to **BETTS** was completed on April 12, 2019.

11.     Box 11e of ATF Form 4473 states, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside." The form contained warnings concerning the consequences of answering the questions on the form falsely. **BETTS**'s Form 4473 was checked "No" in response to the question in box 11e.

12.     Records from the same FFL dealer also showed an ATF Form 4473 for a Taurus Pt.111 G2C 9mm pistol with serial number TLR08219 was purchased by **BETTS** on November 23, 2018. The response to box 11e was checked "No."

13.     On or about August 4, 2019, Dayton Police Officers executed a search warrant, issued by the Dayton Municipal Court, on a 2007 Toyota Corolla bearing Ohio license plate number GNM1586. The vehicle was parked near the scene of the shooting and is believed to have been used by **BETTS** for transportation to the scene and for storage of the weapon he used in the shooting.  Ohio BMV records show **BETTS**'s father as the registered owner.  Among other items, officers recovered a H&R 12 gauge Pardner Pump shotgun.

14.     On or about August 4, 2019 an ATF Firearms Trace was conducted on the shotgun, further described as a Hawk Industries Inc. H&R Pardner Pump 12 gauge shotgun with

4

serial number NZ897689. The purchaser was **Connor Stephen BETTS**, with an address of 2250

Creekview Place, Bellbrook, Ohio, date of birth (DOB) of October 28, 1994 and last four of

Social Security Number (SSN) 6211, identifying information consistent with the aforementioned

BMV and other records.

15. Records obtained from a Dayton area Federal Firearm Licensed (FFL) dealer

included an ATF Form 4473 for a H&R Pardner 12 gauge shotgun with serial number

NZ897689. The transferee/buyer listed on the ATF Form 4473 was **Connor Stephen BETTS**

with the aforementioned address, DOB, and SSN. **BETTS**'s phone number on the form is the

same number listed on the form mentioned in paragraph 10 above. The transfer of the firearm

from the dealer to **BETTS** was completed on June 21, 2019. **BETTS**'s Form 4473 was checked

"No" in response to the question in box 11e.

16. On or about August 4, 2019, **BETTS**'s corpse was taken to the Montgomery

County Coroner for autopsy. During the autopsy, Dayton Police Officers removed property from

the pockets of **BETTS**, including an approximate three inch long black straw with a baggie

attached to the end of it by a rubber band. Inside the baggie was a white powder, which the

seizing officers, based on their training and experience, believe to be cocaine based on its

appearance. The suspected cocaine was submitted to the Miami Valley Regional Crime Lab

(MVRCL) for testing. MVRCL reported, on or about August 9, 2019, that the substance was

cocaine.

17. On or about August 4, 2019, the FBI interviewed a friend of **BETTS**, who was

with **BETTS** at the scene of the shooting and was shot and wounded by **BETTS**, and who for the

purpose of this affidavit will be referred to as C.B. C.B. advised that around July 26 to 28, 2019,

**BETTS** indicated to C.B. that he had relapsed with cocaine and it was not interacting well. C.B.

also stated that **BETTS** had also invited him to go the range and shoot his AR, which C.B. did not do.

18.     On or about August 4, 2019, a large national retail store, with a Federal Firearms License to deal in firearms, provided information to the FBI of weapon purchases made by **BETTS**.  The weapons are further described as an H&R 1228 Pardner 12 gauge shotgun with serial number NZ682493, purchased on May 31, 2013; a DPMS Panther Arms, Inc, M4 Sportical .223-5.56 caliber rifle, with serial number L4017969, purchased on November 26, 2013; and a Mossberg 702 Plinkster 22LR rifle with serial number EML4019811, purchased on May 3, 2015. Records obtained from the retail store included ATF Form 4473s for all three firearms. Box 11e was checked "No" on all three Form 4473s.

19.     On or about August 5, 2019, the FBI interviewed a high school girlfriend of **BETTS**, who for the purpose of this affidavit will be referred to as H.S.  H.S. dated **BETTS** off and on in high school.  She advised the FBI that **BETTS** had abused a number of drugs, including Adderall, Xanax, cocaine, and marijuana. H.S. indicated that **BETTS** purchased pills and cocaine from a manager at the restaurant **BETTS** worked at that time. H.S. advised that **BETTS** had told others he could sell cocaine to them, and that during 2013 to 2014, **BETTS** talked about having hallucinations and feeling like bugs were under his skin.

20.     On or about August 5, 2019, the FBI interviewed another former, but more recent girlfriend of **BETTS**, who for the purpose of this affidavit will be referred to as C.J.  C.J. knew **BETTS** since at least January 2019, having been classmates at a local college.  C.J. dated **BETTS** from at least March 2019, until they severed their relationship in or about May 2019. C.J. indicated that **BETTS** was previously addicted to methamphetamine and was a recovering

6

meth addict. **BETTS** had told her he quit "cold turkey" after going on vacation with his family and he was unable to obtain illegal narcotics.

21.  On or about August 4 to 7, 2019, the FBI interviewed multiple individuals associated with **BETTS.** A co-worker, who for the purpose of this affidavit will be referred to as N.G., advised he was aware **BETTS** used to have a methamphetamine addiction approximately three years ago. A co-worker, who for the purpose of this affidavit will be referred to as K.G., advised that **BETTS** had told K.G. that he used to have a drug abuse problem during high school. When K.G. asked what type of drugs **BETTS** was abusing, **BETTS** mentioned huffing and cocaine. A bandmate of **BETTS,** who for the purpose of this affidavit will be referred to as J.C., advised that **BETTS** had told J.C. he used to use methamphetamine. A co-worker of **BETTS,** who for the purpose of this affidavit will be referred to as C.W., advised that **BETTS** had done methamphetamine in the past. C.W. believed **BETTS** had been clean for approximately four years. A co-worker of **BETTS,** who for the purpose of this affidavit will be referred to as A.G., believed that **BETTS** had a history of drug abuse. A.G. also advised that **BETTS** had a Twitter account.  A.G. showed the interviewers the **ACCOUNT** on his phone and indicated that the **ACCOUNT** was **BETTS**'s Twitter account.

22.  On or about August 7, 2019, Twitter responded to a search warrant issued by the Dayton Municipal Court for the **ACCOUNT**.  Pursuant to this warrant, Twitter provided account information, direct messages, IP addresses, and other information.   The email address cnnrbetts477@gmail.com was provided as the email for the **ACCOUNT**.

23.  On or about August 7, 2019, the FBI interviewed an acquaintance of **BETTS**, who for the purpose of this affidavit will be referred to as J.E. J.E. indicated that he and **BETTS** hung out at least once a month from 2014 through 2017. J.E. indicated that **BETTS** was hardly

ever sober during this time and used heroin, cocaine, methamphetamine, and prescription narcotics. J.E. said that **BETTS** would often show up to his home "messed up."

24.      On or about August 7, 2019, the FBI interviewed a former co-worker of **BETTS**, who for the purpose of this affidavit will be referred to as E.S. E.S. advised that on or about August 2, 2019, at approximately 4:45p.m., **BETTS** came into her place of employment and bought a beer. Before he left, **BETTS** made the comment, "I just popped a xanny, we'll see how it goes." Based on my training and experience, I know that the term "xanny" is often used as street terminology for Xanax, a controlled substance.

25.      On or about August 7, 2019, the FBI interviewed an acquaintance of **BETTS**, who for the purpose of this affidavit will be referred to as J.E. J.E. advised that during the timeframe he and **BETTS** were acquainted, which was late 2018, J.E. believed **BETTS** was using various drugs, including cocaine, methamphetamine, heroin, and molly.

26.      On or about August 8, 2019, the FBI interviewed a friend of **BETTS**, who for the purpose of this affidavit will be referred to as E.K.  E.K. informed the FBI that he and **BETTS** had done "hard drugs," marijuana, and acid together four to five times a week during 2014 to 2015.

27.      On or about August 8, 2019, E.K. was interviewed again by the FBI. E.K. acknowledged his purchase for **BETTS** of the following items used by **BETTS** in the August 4, 2019 shooting in Dayton:  (1) body armor, (2) upper receiver of the AM-15 weapon, and (3) the 100-round double drum magazine.  E.K. indicated that he purchased these items for **BETTS** – and stored them in E.K.'s apartment – to assist **BETTS** in hiding them from **BETTS**'s parents. E.K. indicated that approximately 10 weeks ago while in E.K.'s apartment, E.K. watched and helped **BETTS** assemble the AR-15 weapon used by **BETTS** in the August 4, 2019 shooting in

Dayton. E.K. indicated that upon arrival of the drum magazine approximately 6 to 8 weeks ago, **BETTS** retrieved the assembled weapon, including the drum magazine, and took possession of it and the body armor at that time.

28.     E.K. also informed the FBI that he and **BETTS** used an encrypted messaging application to communicate. E.K. advised that **BETTS** also utilized Twitter and other social media platforms.

29.     Based on my training and experience, I am familiar with the process by which individuals purchase, obtain, possess, and sell firearms and ammunition, and how they obtain, possess, sometimes grow, and use controlled substances. I know that individuals engaged in these activities often utilize email and other online and social media platforms and websites to communicate, including purchasing and planning the purchase of firearms and drugs, arranging the subsequent sale and distribution of firearms and drugs, and discussing the use thereof. I also know that individuals engaged in illegal activity often maintain multiple email and social media accounts.

**BACKGROUND RELATING TO TWITTER**

30.     Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

31.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20

characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

32.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

33.     A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

34.     Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

35.     As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted"

10

the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

36.    Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

37.    Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

38.    When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

39.    A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

11

40.     In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

41.     Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

42.     Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

43.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

44.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

45.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user

for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

46.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates

to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47.     Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

48.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Twitter to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

49.     Based on the foregoing, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(3) (Possession of a firearm by an unlawful user of a controlled substance or by a person addicted to a controlled substance), 18 U.S.C. § 922(a)(6) (false statement regarding firearms), 18 U.S.C. § 924(a)(1)(A) (false statement regarding firearms), 18 U.S.C. § 1001 (false statement), and 21 U.S.C. § 844 (unlawful possession of a controlled substance) have been

committed.  There is also probable cause to search the information described in Attachment A

for evidence of these crimes, as described in Attachment B.

50.    I request that the Court issue the proposed search warrant.  Because the warrant

will be served on Twitter, which will then compile the requested records at a time convenient to

it, reasonable cause exists to permit the execution of the requested warrant at any time in the day

or night.

Respectfully submitted,

P. Andrew Gragan
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on August 23, 2019, in Dayton, Ohio.


HON. MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Twitter account **@iamthespookster** with user ID **2258794200**, that is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., a company headquartered at 1355 Market Street, Suite 900, San Francisco, California 94103.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Twitter, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, Inc. ("Twitter"), including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A from **January 1, 2013 to Present**:

a.      All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

b.      All past and current usernames, account passwords, and names associated with the account;

c.      The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.      All IP logs and other documents showing the IP address, date, and time of each login to the account;

e.      All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

f.      All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

1

g.  All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

h.  All photographs and images in the user gallery for the account;

i.  All location data associated with the account, including all information collected by the "Tweet With Location" service;

j.  All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

k.  All data and information that has been deleted by the user;

l.  A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

m.  A list of all users that the account has "unfollowed" or blocked;

n.  All "lists" created by the account;

o.  All information on the "Who to Follow" list for the account;

p.  All privacy and account settings;

q.  All records of Twitter searches performed by the account, including all past searches saved by the account;

r.  All information about connections between the account and third-party websites and applications;

s. All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II. Information to be seized by the government

1. All records on the Account described in Attachment A that relate to violations of:

- **18 U.S.C. § 922(g)(3)**
- **18 U.S.C. § 922(a)(6)**
- **18 U.S.C. § 924(a)(1)(A)**
- **18 U.S.C. § 1001**
- **21 U.S.C. § 844**

and involve **Connor Stephen BETTS** (**BETTS**) since **January 1, 2013,** including:

a. Any information related to the purchase, use, or possession of firearms;

b. Any information related to the purchase, use, or sale of controlled substances;

c. Any information related to the types, amounts, and prices of controlled substances or firearms purchased, used, or trafficked as well as dates, places, and amounts of specific transactions;

d. Any information related to sources of controlled substances or firearms (including names, addresses, phone numbers, or any other identifying information);

e. Any information recording **BETTS'** schedule or travel from 2013 to the present;

f. All bank records, checks, credit card bills, account information, and other financial records;

g. Records of Internet Protocol addresses used;

    h.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    i.   Evidence indicating how and when the Twitter account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Twitter account owner;

    j.   Evidence indicating the Twitter account owner's state of mind as it relates to the crime under investigation;

    k.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

    l.   The identity of the person(s) who communicated with the user ID, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.